IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES M. BECK,                          *

    Plaintiff,                      *

        v.                       *               Civil Action No.: RDB-11-3075

PATRICK SULLIVAN                        *
and SANDRA PEIFFER,
                            *

    Defendants.                     *

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM OPINION

    The Plaintiff James M. Beck ("Plaintiff" or "Beck") filed this action against the

Defendants Patrick Sullivan ("Sullivan"), Sandra Peiffer ("Peiffer"), and Arbotek Associates,

Inc. ("Arbotek"), alleging breach of contract, tortious interference with contract, intentional

misrepresentations, and conversion. These allegations relate to the sale of the Plaintiff's

company, Avtek Associates, Inc. ("Avtek"), to the Defendants on October 29, 2007.

Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332, as the Plaintiff

is a resident of Montana, and Defendants Sullivan and Peiffer are residents of Maryland. *See*

First Am. Compl. ¶¶ 1-3. Further, the matter in controversy exceeds $75,000. *See id.*

    Prior to conducting a two-day bench trial, the procedural posture in this case is as

follows. The Plaintiff filed a Complaint against the Defendants on October 27, 2011. *See*

Compl., ECF No. 1. On November 17, 2011, the Plaintiff filed a Motion for Temporary

Restraining Order and Preliminary Injunction. *See* TRO & PI Mot., ECF No. 5. The Court

entered an Order granting the Plaintiff's Motion after Defendants Peiffer and Sullivan

1

stipulated and agreed to the preliminary injunctive relief requested. *See* Joint Stip., ECF No. 11; TRO & PI Order, ECF No. 12. After Defendants Peiffer and Sullivan answered the Plaintiff's original Complaint, the Plaintiff filed an Amended Complaint on December 12, 2011. Am. Compl., ECF No. 14. Thereafter, Defendant Arbotek filed a Motion to Dismiss the Plaintiff's First Amended Complaint, ECF No. 16, for failure to state a claim. That motion was denied by this Court on July 6, 2012. *See* Order, ECF No. 21.

During discovery, the Plaintiff encountered very little cooperation from the Defendants Peiffer and Sullivan. As a result, the Plaintiff filed Motions for Sanctions and Motions to Compel against the two Defendants. *See* Mot. for Sanctions & to Compel, ECF No. 25; Show Cause Order, ECF No. 32. When Defendant Peiffer failed to show cause regarding her lack of response to discovery requests, this Court ordered that Default Judgment, only as to liability, be entered against her pursuant to Rule 37(b)(2) and (d) of the Federal Rules of Civil Procedure. *See* Entry of Default J., ECF No. 31. Eventually, Defendant Sullivan was directed to pay $1,020.00 as sanction for his discovery violations. *See* Order, ECF No. 45.

On April 5, 2013, the claims against Defendant Arbotek were dismissed with prejudice, after the parties reached a settlement. *See* Stip. of Voluntary Dismissal, ECF No. 42. As to the remaining Defendants Sullivan and Peiffer, the Plaintiff alleges breach of contract, intentional misrepresentations, and conversion. *See* First Am. Compl. Accordingly, on June 17 and 18, 2013, this Court held a two-day bench trial, proceeding on the issues of liability and damages as to Defendant Sullivan and the issues of damages as to Defendant Peiffer, who was found liable by entry of Default Judgment. The Plaintiff and Defendant

Sullivan called the same two witnesses in their cases-in-chief: the Plaintiff James M. Beck and the Defendant Patrick Sullivan. Based on the exhibits introduced into evidence, the testimony of those two witnesses, the written submissions of the parties, and the oral arguments of counsel, the following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. The accompanying Order enters Judgment in favor of Plaintiff James M. Beck and against Defendants Patrick Sullivan and Sandra Peiffer.

## I. FINDINGS OF FACT

### A. The Formation and Growth of Avtek

This matter involves the purchase of a small business called Avtek Associates, Inc. ("Avtek"). Plaintiff James Beck ("Beck") formed Avtek in 1988. Avtek is a manufacturers' representative firm for companies serving the technology market. As Beck testified, Avtek represents clients (referred to as "principals") in the manufacturing industry, designing products for them and marketing and selling those products in a specific territory. To be successful in the world of manufacturers' representative firms, Avtek needed to increase the number of principals it represents, maintain good customer relations, and understand technology to market products suitable for its principals. According to Beck, Avtek grew to be a profitable firm.

Defendant Sandra Peiffer ("Peiffer") started working at Avtek in 1998 as a sales engineer. Around the same time, Beck began considering the opportunity of selling Avtek and retiring from the manufacturers' representative business. Because Peiffer was a talented

sales person, Beck testified that he began grooming her for the position of President of Avtek, with the hope that she would one day run the firm.

In 2000, Beck promoted Peiffer to Vice President of Sales so that she would have increased exposure to Avtek's principals. At that time, Beck also initiated conversations with Peiffer to discuss the possibility of selling the company to her. However, because Peiffer's interest and talent lay in sales, Beck emphasized that any sale of the company would need to involve not only Peiffer but also someone with organization skills and an administrative background.

Beck moved to Jackson Hole, Wyoming, in 2000, and lived there until 2004. He communicated with Avtek's staff and principals by e-mail and telephone. He also made frequent trips to Avtek's office in Columbia, Maryland. Sometime in 2004 or 2005, Beck promoted Peiffer to President of Avtek. Around that time, Beck moved to Bozeman, Montana, where he currently resides. Beck testified that he maintained his position as owner and chief executive officer of Avtek by communicating remotely with Avtek staff and principals.

While Peiffer was serving as President of Avtek, she met Defendant Patrick Sullivan ("Sullivan"), and the two began dating sometime in late 2006 or early 2007. While the two Defendants were dating, Peiffer contacted Beck and encouraged him to hire Sullivan for a sales position in Avtek's office. Peiffer also endorsed Sullivan as a potential future owner of Avtek, because of his management background working for companies such as McDonnell Douglas, Airbus, and The Boeing Company. Beck held a face-to-face meeting with Peiffer and Sullivan to discuss Sullivan's candidacy and reviewed his resume. Because of Sullivan's

background in management and experience in growing sales for companies, Beck testified that he hired Sullivan as a sales engineer of Avtek in March 2007. At that time, Beck was unaware that Sullivan was in bankruptcy under Chapter 13 of the Bankruptcy Code, by which an individual repays his debts over a period of years.

B. The Sale of Avtek to the Defendants

After Sullivan became a full-time employee of Avtek, Beck testified that he continued discussions regarding the sale of Avtek, now with both Peiffer and Sullivan. Prior to the sale, Beck provided the Defendants all the information that he thought they needed to make an informed decision and explained Avtek's revenue stream and regular expenses. Beck began assessing the value of Avtek using manuals developed by a trade organization of electronics representative associations. Initially, Beck and the Defendants Peiffer and Sullivan agreed that Avtek was worth $1,000,000. A few months prior to the sale of Avtek, however, one of Avtek's major principals, Atmel Corporation ("Atmel"), terminated the firm. When Peiffer, Sullivan, and Beck become aware of the termination of Atmel, they agreed that the value of Avtek should be reduced to $900,000. The Defendants and Beck arrived at that figure by reviewing Avtek's recent revenues and principals. Avtek had brought in $866,178.00 in revenue in 2007, and its revenues in prior years hovered around $700,000 to over $1,000,000. *See* Avtek Revenue History, Pl.'s Ex. 16.

On October 29, 2007, Beck sold Avtek to Peiffer and Sullivan at a closing in which both Beck and the Defendants Peiffer and Sullivan were represented by counsel. Specifically, Peiffer and Sullivan purchased 100% of the stock of Avtek through Avtek Acquisition, Inc. ("Avtek Acquisition"), a company wholly owned by Peiffer and Sullivan.

*See* Stock Purchase Agreement, Pl.'s Ex. 1. Peiffer signed the Stock Purchase Agreement on behalf of Avtek Acquisitions, and both Peiffer and Sullivan signed in their individual capacities. *See id.* In exchange for his stock in Avtek, Beck received a promissory note in the amount of $900,000.00. *See* Promissory Note, Pl.'s Ex. 10. Under the terms of the Promissory Note, Peiffer and Sullivan (through Avtek Acquisition) were to pay Beck $14,166.68 per month for eighty-four months. *Id.*

The Stock Purchase Agreement contains section 5.6, by which Defendants Peiffer and Sullivan affirmed that "[n]o bankruptcy, receivership or debtor relief proceedings are pending" against them. *See* Stock Purchase Agreement § 5.6. Sullivan admits that he read and understood section 5.6. Sullivan also discussed section 5.6 with Peiffer before signing. Although Sullivan knew he was in bankruptcy, Sullivan did not disclose this fact when signing the Stock Purchase Agreement. Sullivan testified that he decided that the fact that he was in bankruptcy would not have any effect on Avtek, and thus he signed the Stock Purchase Agreement knowing it contained a false statement.

The Stock Purchase Agreement also contains a "Covenant Not to Compete" at section 9.2. *See id.* § 9.2. Peiffer and Sullivan agreed that until the Promissory Note had been satisfied, Peiffer and Sullivan would not: (i) "compete with Avtek in the business anywhere within the United States;" (ii) "encourage, induce or solicit any actual or prospective Avtek Principal" to discontinue business with Avtek; (iii) "divert from Avtek business or income from any actual or prospective Avtek Principal;" (iv) refer any prospective Avtek Principal or prospective Avtek customer to any Person other than

Avtek;" or (v) offer services to any Avtek customer in any capacity other than on behalf of and in the name of Avtek. *Id.*

In addition to the Stock Purchase Agreement, Beck, Peiffer, and Sullivan signed other transaction documents containing various collateral and contractual provisions that were meant to dictate Peiffer and Sullivan's obligations with regard to the sale of Avtek. The Management Agreement is one such transaction document. *See* Mgmt. Agreement, Pl.'s Ex. 2. Peiffer signed the Management Agreement on behalf of Avtek Acquisition, and Peiffer and Sullivan signed in their individual capacities as well. In a section of the agreement titled "Management Responsibilities," Peiffer and Sullivan agreed to "manage, operate, administer and maintain [Avtek] in a business-like manner" in compliance with federal, state, and local laws, and in accordance with the terms and conditions of the Stock Purchase Agreement, Management Agreement, and other transaction documents. *Id.* § 3.1.

The Management Agreement structured a series of bank accounts and limitations on the transfer of Avtek funds, which Beck and Sullivan both described as a "lockbox." The purpose of the lockbox was to ensure that installments on the Promissory Note as well as payments for the operating costs of Avtek were satisfied each month. Section 3.2 of the Management Agreement provided that all Avtek revenue would be deposited into a "Holding Account" on a daily basis. *Id.* § 3.2. All commissions and other payments from the principals of Avtek were to go directly into the Holding Account. *Id.* Per section 3.3, electronic transfers from the Holding Account would occur at the end of each month in the following order: first, the monthly Note installment, totaling $14,166.68, would be paid to Beck; and second, the amount needed to cover all operating expenses would be transferred

into an "Operating Account" from which Peiffer and Sullivan would pay for things such as staff salaries and rent. *Id.* § 3.3. Any balance remaining in the Holding Account at the end of the calendar year would be transferred into Avtek's Operating Account. *Id.*

Additionally, Peiffer and Sullivan agreed to the conditions contained in section 3.6, "Books and Records: Financial Reporting." *Id.* § 3.6. Specifically, Peiffer and Sullivan affirmed that they would at all times "maintain materially accurate and complete books and records" pertaining to Avtek's financial condition, and would furnish "quarterly and annual financial statements" of Avtek, including a "balance sheet, income statement, and statement or retained earnings" to Beck. *Id.* In addition, Peiffer and Sullivan agreed to provide any other information reasonably requested by Beck from time to time. *Id.*

Pursuant to a Guaranty Agreement, Avtek Acquisition agreed to irrevocably guarantee "the full and punctual payment, observance and performance of all Obligations." *See* Guaranty Agreement, Pl.'s Ex. 11. Avtek Acquisition, Peiffer, and Sullivan also pledged 100% of the Avtek stock to Beck in the event of default. *See* Avtek Stock Pledge Agreement, Pl.'s Ex. 12; Peiffer Stock Pledge Agreement, Pl.'s Ex. 13; Sullivan Stock Pledge Agreement, Pl.'s Ex. 14. If, for example, the Defendants failed to make a timely payment on the Promissory Note or defaulted on one of their management obligations in the Management Agreement, then Beck could retake Avtek by exercising his rights under the Stock Pledge Agreements. *Id.*

The Promissory Note also dictated that any default by the Defendants would result in an increased default rate of interest, which would be two percent above the then applicable interest rate. Promissory Note § 8. In the event of default, Beck could "declare all unpaid

principal and accrued interest" immediately due. *Id.* § 10. If Beck attempted to enforce the Promissory Note, then the Defendants would be liable for "all costs and expenses incurred," including court costs, costs of appeal, and reasonable attorneys' fees. *Id.*

C. <u>Events Occurring After the Sale of Avtek</u>

After the sale of Avtek on October 29, 2007, the Defendants' began making payments on the Promissory Note, but those payments became sporadic. *See* Note Payment Summary, Pl.'s Ex. 22. The Defendants made ten consecutive, full installments (i.e., monthly payments of $14,166.68) from November 2007 through August 2008, but then failed to pay Beck the monthly installments due for September and October 2008. *See id.* Payments made from November 2008 through June 2011 fluctuated greatly, with some monthly installments going unpaid and some installment totaling as little as $650.00 (paid on June 3, 2011) or as great as $31,000.00 (paid on March 6, 2010). *Id.* The Defendants' payments dropped precipitously in 2009. By the end of 2009, the Defendants had paid only $229,569.39 on the Promissory Note; if they had been making timely installments on the Note, they would have paid Beck a total of $368,333.68. *See id.* In the beginning of 2010, however, it appears that business for Avtek picked up, and the Defendants made several payments at or above the amount due each month. *See id.* (reflecting payments of $20,000 in January 2010, $31,000 in March 2010, and $14,166.68 in both April and June 2010). After June 2010, however, payments dropped precipitously once again. *See id.* No further payment was made after June 2011. *Id.*

Beck first confronted the Defendants about these irregular Note Payments after the Defendants failed to pay him the monthly installments due in September and October 2008.

9

As Beck testified, he met with the Defendants in Maryland, and they explained that Avtek did not have enough money in the Holding Account to cover the installments on the Note. Beck testified that around the same time, Peiffer told him that Sullivan had been offered a job with an Italian airline company, now known as SuperJet. Beck asked if Sullivan had accepted the job offer, and Peiffer said that he had not. Beck continued to fly to Maryland to have conversations with the Defendants in October, November, and December 2008. Beck stated that he explained to the Defendants that if Sullivan was interested in another job, Beck would be willing to return to Avtek and run the company with Peiffer, as it was important that Avtek's leadership involve someone with managerial and administrative skills. The Defendants responded that they remained hopeful that Avtek would be a success and assured Beck that Sullivan was not taking another job.

On January 27, 2009, and without waiving his rights under the various contracts, Beck wrote to the Defendants and directed them to make modified Note payments from January 2009 through June 2009, and then return to their usual monthly schedule for the remainder of 2009. *See* Jan. 27, 2009 Letter, Pl.'s Ex. 18. Under the modified plan, the Defendants would also pay back at least $25,568.02 of its past due amounts for 2009. *See id.* Beck came to Maryland in early February to meet with Peiffer, Sullivan, and a prospective principal of Avtek. While Beck was in town, Peiffer and Sullivan signed Beck's letter, confirming their agreement with the modification to the Note payment schedule. *See id.*

Avtek's revenue dropped in 2009 after Avtek lost one of its major principals, White Electronic Design Corporation ("White Electronics"). According to Beck, the Defendants never told him about the termination of White Electronics. Beck began requesting revenue

forecasts and other financial information from the Defendants, in accordance with section 3.6 of the Management Agreement. Beck testified that it was difficult to get this information from the Defendants—in his words, it was "like pulling teeth."

In March 2010, Beck sat down with Defendant Peiffer in Columbia, Maryland to discuss Avtek's financial condition. It was at this meeting that Beck first discovered that Defendant Sullivan had taken a job with the Italian airline company, SuperJet, as early as January 2008. Peiffer explained that Sullivan was working for the airline and traveling to Italy every four to six weeks, but was still employed at Avtek and maintaining accounts. Peiffer also told Beck that Sullivan was in bankruptcy when he signed the transaction documents on October 29, 2007, and that Peiffer and Sullivan both knew that Sullivan had made a false statement. *See* Management Agreement § 5.6.

Beck testified that this news was devastating and that he was immediately determined to get involved in the management of Avtek. However, because Beck had lost contact with the principals and customers in the industry, he thought that returning to Avtek would be difficult, especially when the Defendants were not cooperating in producing financial information. While these reasons may have discouraged him from returning to Avtek, it is clear that Beck remained in Montana and did not return to Maryland so as to return to active involvement in the business.

While Sullivan testified that he continued working at Avtek for some time after he took the job with SuperJet, this Court finds his testimony not credible. Sullivan did not receive a salary from Avtek at any point after 2008, and he transferred his ownership interest

in Avtek to Peiffer, without notifying Beck, in August 2008. After this point, it is clear from the record that Sullivan was no longer working for Avtek and this Court so finds.

In February 2011, Beck learned from Peiffer that she had been considering a merger or joint venture with another manufacturers' representative firm, Arbotek. According to Beck, he was concerned that a merger would breach some of the contractual provisions of the transaction documents on which the sale of Avtek was based, including the non-competition clause in the Stock Purchase Agreement. Beck learned from Arbotek that Peiffer had given Arbotek a copy of the transaction documents, including the non-competition clause. *See* E-mails between Avtek and Arbotek, Pl.'s Exs. 23-24, 26. Agents of Arbotek told Beck that Arbotek was not interested in a joint venture or merger with Avtek. Sometime in September or October 2011, however, Beck discovered the website of a company called ReSpin Sales, which identified itself as a merger of the two manufacturers' representative firms, Avtek and Arbotek.

In June 2011, counsel for Beck wrote a letter to Peiffer, notifying Peiffer that the Defendants were in breach of the various transaction documents and requesting documents regarding Avtek's financial condition, operating expenses, and expenditures. *See* June 2, 2011 Letter, Pl.'s Ex. 4. When Peiffer failed to respond, Beck retained counsel in Maryland who wrote another letter on August 1, 2011, notifying the Defendants that they were in default, declaring all unpaid principal and accrued interest due, and demanding repayment. *See* Aug. 1, 2011 Letter, Pl.'s Ex. 5. In other letters, counsel for Beck notified the Defendants that he was exercising his rights under the Stock Pledge Agreements and taking 100% of the stock in Avtek Acquisition. *See* Aug. 24, 2011 Letter, Pl.'s Ex. 6; Nov. 15, 2011

Letter, Pl.'s Ex. 7.  Counsel for Beck requested that the Defendants send pertinent financial information to Beck and take efforts to store and preserve any documents and electronic information relating to Avtek and Avtek Acquisition, since litigation was likely.  *Id.*; *see also* Jan. 31, 2012 Letter, Pl.'s Ex. 8; May 10, 2012 Letter, Pl.'s Ex. 9.  The Defendants did not respond to these letters and refused to provide any of the financial information Beck requested.  Indeed, Sullivan did not provide any documents to Beck until January 2013 when ordered to do so by this Court.  Peiffer never responded to any discovery requests in this case.

Beck eventually learned that the Defendants had been directing funds into a separate bank account set up with M&T Bank, rather than placing them in the Avtek Holding Account, which was set up with Howard Bank.  *See, e.g.*, Peiffer & Micrel E-mails, Pl.'s Exs. 26, 27.  *Compare* Howard Bank Avtek Holding Account Statements, Pl.'s Ex. 19, *with* Howard Bank Operating Account Statements, Pl.'s Ex. 20, *and* M&T Bank Statements, Pl.'s Ex. 21.  As summarized in Plaintiff's Exhibit 29, $57,706.32 in commissions and other payments were directed into a bank account with M&T Bank.  Deposits Summary, Pl.'s Ex. 29.  In addition, the Defendants deposited $71,851.60 directly into the Avtek Operating Account, bypassing the Holding Account.  *See id.*  In sum, the Defendants deposited $129,557.92 of Avtek's funds into accounts other than the Avtek Holding Account, in contravention of sections 3.2 and 3.3 of the Management Agreement.  *See id.*

In addition, Beck was able to discover several checks that Peiffer cashed for her own use out of Avtek funds.  Specifically, Peiffer cashed one check of $50.00 on August 3, 2011, and another on August 31, 2011 in the amount of $4,900.00, both out of Avtek's funds.  *See*

M&T Bank Statements, BECK 102527 & 102530. Peiffer also wrote a check, made payable to herself, on November 26, 2011 in the amount of $9,000. *See* Nov. 26, 2011 Check, Pl.'s Ex. 30.

As described in some of the letters from Beck's counsel, Beck exercised his rights under the Stock Pledge Agreement and acquired all of the shares of stock that the Defendants had pledged to him in late August 2011. According to Beck, the value of Avtek as of November 2011 is close to zero. The firm appears to have no principals or revenue, and the physical offices are emptied.

D. <u>Defendants' Conduct During Litigation</u>

Beck filed this action on October 27, 2011. Because Peiffer and Sullivan were uncooperative during discovery, this Court ordered discovery sanctions as to both Defendants. Peiffer ignored requests for interrogatory responses and failed to communicate with her counsel for at least one month afterward. *See* Mot. for Sanctions, ECF No. 25. After Peiffer failed to respond to this Court's Show Cause Order, ECF No. 29, this Court ordered that Default Judgment as to liability be entered against her pursuant to Rule 37(b)(2) and (d) of the Federal Rules of Civil Procedure. *See* Entry of Default J., ECF No. 31. After Defendant Sullivan submitted a response to a similar Show Cause Order, ECF No. 32, as well as written responses to the Plaintiff's interrogatories, he was directed to pay $1,020.00 to Plaintiff's counsel as sanction for his discovery violation. *See* Order, ECF No. 45.

While Sullivan eventually submitted documents during discovery, he never produced e-mail messages pertaining to his work at Avtek. Sullivan testified that he placed a file containing all relevant e-mails on Dropbox, a cloud service, and later suffered hard drive

failure. However, his counsel affirmed that while Sullivan placed some files on Dropbox, he was not able to find any files containing the relevant e-mails. They were never recovered from Sullivan's hard drive.

## II. CONCLUSIONS OF LAW

As to the two remaining Defendants Sullivan and Peiffer,[1] Beck alleges breach of contract, intentional misrepresentations, and conversion. *See* First Am. Compl., ECF No. 14. Specifically, Beck claims that both Peiffer and Sullivan committed breach of contract (Count One) by (1) diverting Avtek revenue away from the Avtek Holding Account; (2) diverting Avtek customers away from Avtek for personal gain; (3) failing to operate Avtek in accordance with the Stock Purchase Agreement; (4) failing to comply with Plaintiff's requests for cooperation regarding the transfer of control of Avtek; (5) failing to provide timely and complete financial reporting as required under the Management Agreement; (6) violating the non-competition clauses in the Stock Purchase Agreement; (7) failing to keep Avtek in good standing with the Maryland State Department of Assessments and Taxation; (8) failing to maintain life insurance on Defendant Peiffer; and (9) falsely representing that no bankruptcy proceeding was pending against Defendant Sullivan. *See id.* ¶¶ 26-29. In addition, Beck maintains that Peiffer and Sullivan intentionally misrepresented their joint venture with Arbotek (Count Three), Defendant Sullivan's pending bankruptcy action (Count Four), and Defendant Sullivan's employment at SuperJet (Count Five). *See id.* ¶¶ 35-48. Beck also contends that both Defendants committed conversion by purposefully diverting funds from the Avtek Holding Account (Count Six).

---

[1] Beck's claims against Defendant Arbotek were dismissed with prejudice on April 5, 2013, after the parties reached a settlement. *See* Stip. of Voluntary Dismissal, ECF No. 42.

*See id.* ¶¶ 49-52. Finally, Beck seeks declaratory judgment that Beck's actions in transferring the stock of Avtek to himself was a legitimate exercise of his rights under the Stock Pledge Agreement and that he now has exclusive right to control and manage those corporations (Count Seven). *See id.* ¶¶ 53-58.

At the outset, certain claims were disposed of during a motions hearing held pursuant to Rule 52(c) of the Federal Rules of Civil Procedure at the close of the Plaintiff's case. Count Three, which alleges intentional misrepresentation regarding Avtek's joint venture, ReSpin Sales, and Count Six, alleging conversion, were DISMISSED against Defendant Patrick Sullivan, upon agreement of the parties. Counts Three and Six remain pending, however, against Defendant Sandra Peiffer. In addition, Count Seven, which seeks declaratory judgment, was DISMISSED AS MOOT against both Defendants, upon agreement of the parties. Accordingly, this Court must make conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, with regard to the following counts: Count One, as against both Defendants; Count Three, as against only Defendant Peiffer; Count Four, as against both Defendants; Count Five, as against both Defendants; and Count Six, as against only Defendant Peiffer.

A.      Breach of Contract (Count One)

This Court finds that both Peiffer and Sullivan breached numerous contractual provisions of the transaction documents underlying the sale of Avtek. To prevail on a breach of contract claim under Maryland law, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645 (Md. 2001) (citation omitted).

The two major transaction documents at issue are the Stock Purchase Agreement and Management Agreement, both of which Defendants Peiffer and Sullivan signed in their individual capacities as purchasers and managers of Avtek. *See* Stock Purchase Agreement, Pl.'s Ex. 1; Management Agreement, Pl.'s Ex. 2. These agreements establish joint and several liability for any breach by the Defendants. *See* Stock Purchase Agreement § 5, 9.2; Management Agreement § 8.9. Moreover, the agreements do not set out obligations for which either Peiffer or Sullivan alone was responsible; the terms of the two agreements indicate that *both* Defendants were required to maintain *all* obligations. Both Peiffer and Sullivan were therefore bound to abide by the obligations contained in these agreements.

Defendants Peiffer and Sullivan breached their obligations under the Stock Purchase Agreement. First, they falsely represented that Sullivan was not involved in a bankruptcy proceeding, even though section 5.6 of the Stock Purchase Agreement required them to affirm that there was no bankruptcy proceeding pending against either of them. Stock Purchase Agreement § 5.6. Sullivan admitted at trial that he signed the Stock Purchase Agreement knowing it was false, because of his ongoing case under Chapter 13 of the Bankruptcy Code. This Court finds that Peiffer also breached this obligation, because she was aware of Sullivan's bankruptcy proceeding at the time of the closing but signed the agreement affirming that, to the best of her knowledge, no bankruptcy proceeding was pending against either of them. *See id.*

Peiffer and Sullivan also breached the Covenant Not to Compete in section 9.2 of the Stock Purchase Agreement. *See* Stock Purchase Agreement § 9.2. The Defendants had agreed that until the Promissory Note was satisfied, they would not, without the prior

consent of Beck, (i) "compete with Avtek in the business anywhere within the United States;" (ii) "encourage, induce or solicit any actual or prospective Avtek Principal" to discontinue business with Avtek; (iii) "divert from Avtek business or income from any actual or prospective Avtek Principal;" (iv) refer any prospective Avtek Principal or prospective Avtek customer to any Person other than Avtek;" or (v) offer services to any Avtek customer in any capacity other than on behalf of and in the name of Avtek. *Id.* By forming the joint venture ReSpin Sales, Peiffer attempted to direct actual or prospective Avtek principals, as well as business or income, away from Avtek to ReSpin Sales. Having signed the Stock Purchase Agreement in his individual capacity and agreed to be jointly and severally liable, Sullivan is also liable for this breach.

In addition, Peiffer and Sullivan breached sections 3.2, 3.3, and 3.6 of the Management Agreement. Beck testified at trial that he made numerous requests to obtain financial information about Avtek. Beck also submitted as evidence several letters from counsel which indicate that the Defendants were not cooperative in providing Avtek's financial reporting information. *See, e.g.,* June 2, 2011 Letter, Pl.'s Ex. 4; Aug. 24, 2011 Letter, Pl.'s Ex. 6; Nov. 15, 2011 Letter, Pl.'s Ex. 7; Jan. 31, 2012 Letter, Pl.'s Ex. 8; May 10, 2012 Letter, Pl.'s Ex. 9. Under section 3.6 of the Management Agreement, the Defendants agreed to maintain accurate books and records and furnish financial statements, as well as any other reasonably requested information, "with respect to the operation, business, affairs, assets, and financial condition" of Avtek from time to time. Management Agreement § 3.6. By failing numerous times to provide Beck with the financial information he requested, the Defendants breached this provision of the Management Agreement.

Peiffer and Sullivan also breached sections 3.2 and 3.3 of the Management Agreement, the sections that structured the so-called lockbox. Beck has produced evidence showing that the Defendants deposited funds into the Avtek Operating Account, bypassing the Holding Account, in contravention of section 3.2. *See* Deposits Summary, Pl.'s Ex. 29; Howard Bank Avtek Holding Account Statements, Pl.'s Ex. 19; Howard Bank Operating Account Statements, Pl.'s Ex. 20. Beck has likewise produced evidence showing that the Defendants directed principals of Avtek to deposit commissions into an account with M&T Bank, rather than the Holding Account with Howard Bank. *See* Deposits Summary. *Compare* Howard Bank Avtek Holding Account Statements, *with* Howard Bank Operating Account Statements, *and* M&T Bank Statements, Pl.'s Ex. 21. Accordingly, the Plaintiff has proven a breach of sections 3.2 and 3.3 of the Management Agreement.

Finally, Peiffer and Sullivan have clearly breached their obligations under the Promissory Note. While they agreed to pay $14,166.68 in monthly installments on the Promissory Note, they failed to make many of those payments. *See* Note Payment Summary, Pl.'s Ex. 22. Beck notified Peiffer and Sullivan several times that they were in default. *See, e.g.*, Jan. 27, 2009 Letter, Pl.'s Ex. 18. While Beck modified the Note payment schedule for a period from January 2009 to June 2009, he did not waive his rights attendant to the Promissory Note. *See id.*

At trial, Defendant Sullivan argued that Beck's breach of contract claim cannot prevail, because the Management Agreement was void as against public policy. According to Sullivan, the Management Agreement unduly restricted his independent judgment and prevented him from acting in the best interests of Avtek. To find the Management

Agreement void as against public policy, it would have to be shown that the contract prevented Sullivan from performing his duty "to the state, to the corporation and to the general body of shareholders to exercise individually his best and impartial judgment on behalf of the corporation." *In re Petrol Terminal Corp.*, 120 F. Supp. 867, 877 (D. Md. 1954); *see also Reed & Fibre Prods. Corp. v. Rosenthal*, 138 A. 665 (Md. 1927) (explaining that a "stockholder or director of a corporation should at all times be untrammeled and free to exercise his judgment in respect to all corporate matters for the best interests of the corporation"). None of the cases cited by Sullivan, however, implicates an agreement to purchase the corporation like the Management Agreement in this case. Rather, they involve an agreement to issue stock, *see Reed & Fibre Prods.* 138 A. at 671-72, or an agreement between a large stockholder and president of the corporation that the president would be employed for twenty years in an executive capacity, *see Petrol Terminal*, 120 F. Supp. at 876-77. Likewise, the United States Supreme Court's decision in *West v. Camden*, 135 U.S. 507 (1890), on which Sullivan also relies, held that a contract by which a stockholder agreed that a particular director would continue to serve as a director with a set salary, regardless of the best interests of the company, was contrary to public policy and void.

The Management Agreement is wholly unlike the contracts in these cases that were found to violate public policy. In particular, the lockbox provisions of the Management Agreement did not constrain the Defendants' judgment with regard to Avtek. Rather, they permitted the Defendants to buy Avtek. The sale of the company was by way of a Stock Purchase Agreement supported by a Promissory Note. Because Peiffer and Sullivan could not pledge any collateral as security, the parties agreed to a set of contractual provisions,

whose purpose was to ensure that installments on the Note and payments for Avtek's operating expenses were satisfied before any other expenditure. Sullivan fails to demonstrate how these provisions, which ensured that Peiffer and Sullivan satisfied the obligations to which they agreed in order to purchase Avtek, constrained their judgment regarding the best interests of Avtek. Accordingly, this Court finds that the Management Agreement was not void as against public policy, and that the Defendants Peiffer and Sullivan breached numerous contractual provisions of the Management Agreement, the Promissory Note, and the Stock Purchase Agreement.

B. <u>Intentional Misrepresentation Regarding Avtek's Joint Venture with Arbotek (Count Three)</u>

This Court finds that Beck has not met his burden in proving that Peiffer committed fraud by intentionally misrepresenting Avtek's joint venture with Arbotek. A plaintiff can recover for fraudulent inducement based on an intentional misrepresentation only by showing clear and convincing evidence of the following: (1) that the representation made is false; (2) that its falsity was either known to the defendant, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the plaintiff; (4) that the plaintiff not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that the plaintiff would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that the plaintiff actually suffered damage directly resulting from such fraudulent misrepresentation. *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 660 (Md. Ct. Spec. App. 2012) (citing *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 838 A.2d 404 (Md. Ct. Spec. App. 2003)).

21

It may be that agents of Arbotek, which is no longer a party to this case, made a false representation about Arbotek's interest in a joint venture with Avtek. The First Amended Complaint focuses on the fact that Arbotek's agents had told Beck that Arbotek had no interest in a joint venture in June 2011, and that three or four months later Beck discovered the website for ReSpin Sales, a company resulting from the merger of Avtek and Arbotek. *See* First Am. Compl. ¶¶ 36-40. However, Beck failed to prove at trial that Defendant Peiffer made any false statement regarding Avtek's joint venture with Arbotek. By Beck's own testimony, the false statements were made not by Peiffer but by Arbotek's agents. Accordingly, Beck fails to prove Count Three against Defendant Sandra Peiffer, and Count Three is therefore DISMISSED against Peiffer.

      C.      <u>Intentional Misrepresentation Regarding Sullivan's Bankruptcy Proceeding (Count Four)</u>

This Court finds that both Peiffer and Sullivan committed fraud by intentionally misrepresenting Sullivan's bankruptcy proceeding when they signed the Stock Purchase Agreement. Section 5.6 of that agreement required each Defendant to affirm that "[n]o bankruptcy, receivership or debtor relief proceedings" were pending against either of them. *See* Stock Purchase Agreement § 5.6. The prima facie case for intentional misrepresentation is recited in Section II.B *supra*.

As to the first element of intentional misrepresentation, it is clear that by signing section 5.6 of the Management Agreement, Sullivan created a false statement. Sullivan admitted at trial that he knew his affirmation in section 5.6 was false, because of his pending Chapter 13 bankruptcy case. Likewise, Sullivan made Peiffer aware of the fact that he was in bankruptcy, and she nonetheless signed the Management Agreement and affirmed that she

knew of no bankruptcy proceeding against either Defendant. Thus each Defendant made a false statement. For these same reasons, the second element of intentional misrepresentation is also met. Both Peiffer and Sullivan knew that the statement was false.

Third, Beck proved by clear and convincing evidence at trial that the statement was made for defrauding him. Sullivan testified that in his opinion, his pending bankruptcy case should not have had any bearing on the sale of Avtek to him and Peiffer. However, it is clear that Sullivan read and understood this provision of the contract and concealed his bankruptcy case so that Beck would go forward with the sale of Avtek. Whether Sullivan took issue with the relevance of section 5.6 to the sale of Avtek has no bearing on the analysis. What is relevant is that Sullivan knowingly made the false statement to ensure that the deal went forward. Defendant Peiffer failed to disclose the falsehood for the same reason—she wanted to purchase Avtek and knew that Beck would not sell the company unless she was partnered with Sullivan.

Fourth, this Court finds that Beck relied on the Defendants' misrepresentation and had the right to rely on it. He sought the information he deemed pertinent to the sale in his Management Agreement. Moreover, it is evident that Beck would not have gone forward with the sale of Avtek if he had known that Sullivan was in bankruptcy. Beck testified without hesitation to this fact, and this Court finds his testimony credible. In the sale of a company worth $900,000 in which the purchasers pledged no collateral, it was entirely reasonable for Beck to be concerned with the financial status of the two purchasers. For this same reason, the fifth element of the prima facie case is met. Beck suffered damages

from the intentional misrepresentation, because if he had known of Sullivan's Chapter 13 case, he would not have gone forward with the sale of Avtek at that time.

D.    Intentional Misrepresentation Regarding Sullivan's Employment at SuperJet (Count Five)

This Court also finds that Beck proved that both Sullivan and Peiffer intentionally misrepresented Sullivan's employment at SuperJet. Beck testified credibly to the fact that he returned to Maryland for meetings with the Defendants in October, November, and December 2008. At those meetings, he spoke with both Peiffer and Sullivan about Sullivan's job offer. Though Beck offered to return to Avtek and run the company with Peiffer, the Defendants assured him that Sullivan was not taking another job. Testimony at trial also indicates that after 2008, Sullivan no longer worked at Avtek. Sullivan did not receive a salary from Avtek at any point after 2008, and he transferred his ownership interest in Avtek to Peiffer, without notifying Beck, in August 2008.

Based on these facts, Beck showed by clear and convincing evidence that both Sullivan and Peiffer falsely stated that Sullivan would not be seeking another job. All the while, they either knew, or at the very least acted with reckless disregard to the fact, that Sullivan was accepting an offer with SuperJet and relinquishing his ownership interest in Avtek. Thus, the first two elements of the prima facie case for intentional misrepresentation are met.

Third, the Defendants' statements were made for the purpose of defrauding Beck. The testimony and evidence at trial showed clearly that the Defendants were not interested in having Beck return to Avtek, and they made the false statements to keep him at bay. Fourth, it was reasonable for Beck to rely on these statements, and if Beck had known that

Sullivan was taking another job, it is evident that he would have returned to Avtek. Beck testified credibly to the fact that he did not want Peiffer to run Avtek alone, due to her lack of managerial skills. Finally, Beck suffered damages by the Defendants' intentional misrepresentations, because he would have exercised his contractual rights to retake Avtek sooner, had he known of Sullivan's employment at SuperJet. Accordingly, Beck proved Count Five against both Peiffer and Sullivan by clear and convincing evidence.

     E.    <u>Conversion (Count Six)</u>

Finally, this Court finds that Beck proved his conversion claim under Count Six as to Defendant Peiffer. Conversion is an intentional tort consisting of two elements, "a physical act combined with a certain state of mind." *Dynacorp*, 56 A.3d at 685 (citing *Lasater v. Guttmann*, 5 A.3d 79, 88 (Md. Ct. Spec. App. 2010)). "It is defined as any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Lasater*, 5 A.3d at 88 (internal quotation marks and citation omitted). The act of ownership can occur "either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.*

At trial, Beck proved that Peiffer committed conversion. Beck offered exhibits showing that Peiffer cashed two checks for her own use out of Avtek funds. Specifically, Peiffer cashed one check of $50.00 on August 3, 2011, and another on August 31, 2011, in the amount of $4,900.00, both out of Avtek's funds. See M&T Bank Statements, BECK 102527 & 102530. Peiffer also wrote a check, made payable to herself, on November 26, 2011 in the amount of $9,000. See Nov. 26, 2011 Check, Pl.'s Ex. 30. It is therefore evident that Peiffer transferred these funds from Avtek to herself in contravention of sections 3.2

and 3.3 of the Management Agreement. *See* Management Agreement §§ 3.2, 3.3. Peiffer clearly took ownership over the property of Avtek. Furthermore, she converted the funds inconsistent with the Management Agreement and with Beck's right, under section 3.3 of the Management Agreement, to receive those funds as part of his monthly installments on the Promissory Note. Therefore, Peiffer is liable for conversion.

*     *     *

In sum, Judgment SHALL BE ENTERED in favor of Plaintiff Beck and against Defendants Peiffer and Sullivan for breach of contract and intentional misrepresentations, under Counts One, Four, and Five of the First Amended Complaint. In addition, Judgment shall be entered in favor of Beck and against Peiffer for conversion under Count Six. However, this Court finds that Peiffer is not liable for intentional misrepresentations regarding Avtek's joint venture under Count Three.

F.     <u>Damages for Breach of Contract and Intentional Misrepresentations</u>

Having found the Defendants Peiffer and Sullivan liable for breach of contract and intentional misrepresentations, Beck argues that he is entitled to the benefit of the bargain, totaling to $900,000 in damages. This Court finds, however, that the amount of damages to which Beck is entitled must be reduced to account for Beck's failure to mitigate damages.

Beck had the right under the Stock Pledge Agreements to retake all of the shares of stock pledged by Avtek, Peiffer, and Sullivan at the first moment of default. *See* Avtek Stock Pledge Agreement, Pl.'s Ex. 12; Peiffer Stock Pledge Agreement, Pl.'s Ex. 13; Sullivan Stock Pledge Agreement, Pl.'s Ex. 14. The first time the Defendants defaulted was in September 2008. *See* Note Payment Summary, Pl.'s Ex. 22. Thereafter the Defendants committed

26

several other breaches that should have alerted Beck to the fact that the Defendants were consistently failing to satisfy their contractual obligations. Beck met with the Defendants numerous times to inform them that they were in default and that he was in a position to exercise his contractual rights. Beck also emphasized repeatedly that he was inclined to return to Avtek to help the company regain its footing.

The Court of Special Appeals of Maryland has explained the duty to mitigate as follows:

> [W]here one party commits a breach of contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss he sustains as a result of the breach, and he can charge the party in default with such damages only as, with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent.

*Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P.*, 908 A.2d 684, 722-23 (Md. Ct. Spec. App. 2006) (quoting *Sergeant Co. v. Pickett*, 401 A.2d 651 (Md. 1979)), *vacated on other grounds*, 929 A.2d 932 (Md. 2007). The defendant has the burden of proving that the plaintiff could have avoided losses. *Id.* Additionally, "[t]he party who is in default may not mitigate his damages by showing that the other party could have reduced those damages by expending large amounts of money or incurring substantial obligations." *Wartzman v. Hightower Prods., Ltd.*, 456 A.2d 82, 88 (Md. Ct. Spec. App. 1983).

This Court finds that by March 2010, Beck should have made the reasonable effort of exercising his contractual rights to retake Avtek. After a rocky year in 2008, Beck agreed to modify the Note payment schedule for the first six months in 2009. *See* Jan. 27, 2009 Letter, Pl.'s Ex. 18. This modification permitted the Defendants to put Avtek's revenue toward the company's monthly operating expenses and, Beck hoped, keep the company afloat.

However, the Defendants did not return to their usual monthly schedule for the remainder of 2009. By the end of 2009, the Defendants were behind in Note payments by approximately $138,765.00. *See* Note Payment Summary, Pl.'s Ex. 22. In the latter half of 2009, the Defendants also began to stall in meeting their obligations under 3.6 of the Management Agreement, which required that they share financial information reasonably requested by Beck. As Beck testified, trying to obtain any financial information about Avtek was "like pulling teeth."

Finally, in March 2010, Beck met with Defendant Peiffer in Columbia, Maryland to discuss Avtek's financial condition. At this meeting, Peiffer informed Beck of two critical pieces of information—first, that Sullivan had taken a job with SuperJet, contrary to the false statements that both Defendants had made just three or four months before; and second, that Sullivan was in bankruptcy when he signed the transaction documents on October 29, 2007, and that both Defendants were aware of that false statement. At this point, it would have been reasonable for Beck to exercise his rights under the Stock Pledge Agreements and retake Avtek. Beck had commented several times that he was interested in reentering the company, and he testified that at the end of this meeting in March 2010, he was determined to get beck involved in the management of Avtek. Though Beck suggests that he faced great difficulties in doing so, because he had lost contact with principals and customers of Avtek, cross examination of Beck revealed that while he was retired from Avtek he kept in touch with some companies in the industry and maintained professional friendships.

Based on Beck's testimony, the conduct of the Defendants over the course of 2008 and 2009, and the information revealed by Peiffer at the meeting in March 2010, this Court

finds that Beck should have mitigated his losses by exercising his contractual rights to retake Avtek in March 2010. Accordingly, this Court finds that rather than the benefit of the bargain, Beck is owed damages in the amount of the Note payments that, had the Defendants been meeting their obligations, he would have received by the end of March 2010. At that point, the Defendants should have paid Beck 29 installments of $14,166.68 on the Promissory Note, or a total of $410,833.72. However, Plaintiff's Exhibit 22, reflecting the Defendants' Note payment history, shows that the Defendants had only paid Beck $285,269.39 by the end of March 2010. Accordingly, the Defendants were behind in Note payments by $125,564.33. The Defendants shall therefore be jointly and severally liable for $125,564.33. Additionally, as Beck is the party prevailing in an action to enforce the various transaction documents, he is entitled to reasonable attorneys' fees and court costs. *See* Stock Purchase Agreement § 13.11.

G.    Damages for Conversion

Having found Defendant Peiffer liable for conversion, Beck is also owed the amount of Avtek funds that Peiffer converted. Those funds belonged to Avtek, and pursuant to sections 3.2 and 3.3 of the Management Agreement, they should have been transferred to Beck as part of the monthly installments due on the Promissory Note. Specifically, Peiffer cashed checks for $50.00 and $4,900.00 out of Avtek's funds. See M&T Bank Statements, BECK 102527 & 102530. Peiffer also wrote a check, made payable to herself, in the amount of $9,000. See Nov. 26, 2011 Check, Pl.'s Ex. 30. Accordingly, Beck is entitled to damages in the amount of $13,950.00, the total amount of funds converted by Peiffer.

H.    <u>Punitive Damages</u>

Finally, Beck argues that he should receive punitive damages against both Peiffer and Sullivan.  While this Court does not find that Sullivan's conduct warrants punitive damages, it does find grounds to award punitive damages as to Peiffer.

As the Maryland Court of Appeals has explained, an award of punitive damages penalizes a defendant for his malice:

> [T]o entitle one to such damages there must be an element of fraud, or malice, or evil intent . . . entering into and forming part of the wrongful act.  It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others.  But where the act, although wrongful in itself, is committed in the honest assertion of a supposed right-or in the discharge of duty, or without any evil or bad intention, there is no ground on which such damages can be awarded.

*Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1122 (Md. 1995) (quoting *Phila., Wilmington & Balt. R.R. Co. v. Hoeflich*, 62 Md. 300, 307 (Md. 1884)).  A defendant may be exposed to punitive damages only if he was conscious of the wrongdoing.  *Id.* at 1125.  Where a plaintiff prevails in proving a fraudulent statement, Maryland's highest court has concluded that a "defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages."  *Id.* at 1126.

In this case, Sullivan's actions do not support the imposition of punitive damages. While this Court finds that he committed fraud by intentional misrepresentations, his actions are not so "heinous" as to necessitate punitive damages and deterrence.  *Id.* at 1122.  Though at trial Beck suggested that Sullivan had engaged in spoliation of the evidence, therefore making his conduct seem more intentional and malicious, this Court does not find that

Sullivan was engaging in spoliation. Sullivan testified that he suffered a computer hard drive failure after he attempted to transfer certain documents to his counsel during discovery, and this Court finds no reason to impute some more menacing motive to Sullivan's conduct.

Peiffer's conduct, however, does compel the imposition of punitive damages. Knowing full well her contractual obligations, Peiffer circumvented them at every turn. As Beck began to scrutinize more heavily Peiffer's leadership and the financial condition of Avtek, Peiffer delayed in responding to Beck's requests for information, directed principals to deposit commissions and other payments due to Avtek in an unauthorized account, and converted Avtek's funds for her own use. All the while, she concealed these activities from Beck and attempted to keep him at bay. In short, Beck proved that Peiffer had actual knowledge of her false statements to Beck and that she clearly possessed the intent to deceive Beck. Under Maryland law, therefore, Peiffer possessed the requisite mental state of actual malice to justify an award of punitive damages. *Id.* at 1126.

Accordingly, this Court finds that Peiffer should be exposed to punitive damages in the amount of $129,557.92, which equates to the total amount of unauthorized deposits of Avtek funds. *See* Deposits Summary, Pl.'s Ex. 29. This amount adequately serves as punishment for Peiffer's "evil motive" as well as "an example or warning to others." *See id.* at 1122 (quoting *Hoeflich*, 62 Md. at 307).

## III.  CONCLUSION

For the reasons stated above, Judgment is hereby entered in favor of the Plaintiff James M. Beck and against the Defendants Sandra Peiffer and Patrick Sullivan on Count One for breach of contract, and Counts Four and Five, for intentional misrepresentations.

Additional, Judgment is entered in favor of the Plaintiff Beck and against Defendant Peiffer on Count Six, for conversion. However, no Judgment is entered against Defendant Peiffer on Count Three, alleging intentional misrepresentation regarding Avtek's joint venture.

The Defendants Peiffer and Sullivan shall be jointly and severally liable for $125,564.33 in damages for breach of contract and intentional misrepresentations. Defendant Peiffer shall also be liable for $13,950.00, the total amount of Avtek funds that she converted. Because Peiffer committed fraud with actual malice, and due to the heinousness of her wrongdoing, Peiffer shall be liable for punitive damages in the amount of $129,557.92, the total amount of unauthorized deposits of Avtek funds. Finally, as the Plaintiff Beck is the party prevailing in an action to enforce the various transaction documents, the Defendants shall be liable for Beck's reasonable attorneys' fees and court costs.

A separate Order and Judgment follows.


Dated: July 2, 2013                    _____/s/_____
                                       Richard D. Bennett
                                       United States District Judge